1

2                          **<u>AFFIDAVIT</u>**

3       I, Cory Oravecz, being duly sworn, declare and state as follows:

4                                  **I.**

5                            **INTRODUCTION**

6       1.   I am a Special Agent ("SA") with the Department of

7  Defense, Office of Inspector General, Defense Criminal Investigative

8  Service (DCIS) and have been so employed since October 2017.  I am

9  currently assigned to the Western Field Office, Mission Viejo

10 Resident Agency.  My experience as a DCIS SA has included the

11 investigation of cases involving health care fraud, money laundering,

12 bank fraud, mail and wire fraud, and the use of computers and the

13 Internet to commit fraud.  From 2009-2017, I was an SA with the U.S.

14 Department of Labor – Office of Inspector General, where I employed

15 my skills in conducting various criminal felony-level investigations

16 including labor racketeering, grant fraud, aggravated identity theft,

17 and other financial-related crimes.

18      2.   As a DCIS SA, I have received training and gained

19 experience in interview and interrogation techniques, arrest

20 procedures, search warrant applications, the execution of searches

21 and seizures, computer crimes, mail fraud, wire fraud, money

22 laundering, health care fraud, and other computer-based crimes,

23 computer evidence identification, computer evidence seizure and

24 processing, and various other criminal laws and procedures.  I have

25 participated in the execution of various search warrants regarding

26 health care fraud and have assisted with the seizure of evidence.

27      3.   I submit this affidavit in connection with a health care

28 fraud investigation that I am conducting along with the Federal

PGS:pgs

Bureau of Investigation, U.S. Department of Labor – Employee Benefit Security Administration, U.S. Department of Labor – Office of Inspector General and Internal Revenue Service – Criminal Investigation Division.  The facts presented in this affidavit are based on the investigation conducted by representatives of the aforementioned law enforcement agencies, discussions with those officers/agents, and on my personal investigation, training, experience in investigating similar fraudulent medical operations, and review of records and data.

4.   This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.

## PURPOSE OF AFFIDAVIT

5.   This affidavit is made in support of an application for warrants to seize:

a.   One 2015 Cadillac Escalade, VIN 1GYS3MKJ7FR578933 (the "Subject Vehicle")

b.   Up to $3,421,000.00 in Morgan Stanley Account Number 269-061405, held in the name of MSL FBO James N. Bell & Crystal Bell Co-Ttee James & Crystal Bell Trust U/A DTD 10/19/2015 ( "Subject Account 1")

c.   Up to $1,550,000.00 in Morgan Stanley Account Number 269-063104, held in the name of MSL FBO James N. Bell &

Crystal Bell Co-Ttee James & Crystal Bell Trust U/A DTD 10/19/2015 ("Subject Account 2"), collectively the "Subject Assets."

6. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that the Subject Assets represent property which constitutes or is derived from proceeds traceable to one or more violations of the following statues, and are therefore subject to seizure pursuant to 18 U.S.C. §981(b) and forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(C):

     a.   mail fraud, in violation of Title 18, United States Code, Section 1341;

     b.   wire fraud, in violation of Title 18, United States Code, Section 1343;

     c.   healthcare fraud, in violation of Title 18, United States Code, Section 1347;

     d.   conspiracy to commit fraud, in violation of Title 18, United States Code, Section 1349;

     e.   conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956;

     f.   aggravated identity fraud, in violation of Title 18, United States Code, Section 1028A;

     g.   conspiracy to pay illegal remunerations for health care related purchases in violation of Title 18, United States Code Section 371; and,

     h.   illegal remunerations for health care related purchases in violation of Title 42 United States Code Section 1320a-7b(b) (the "Subject Offenses").

7. In addition, there is probable cause to believe that the Subject Assets are subject to seizure and forfeiture to the United

States pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f) because they would, in the event of conviction on the alleged underlying offenses, be subject to forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

8.   My knowledge of the facts set forth in this affidavit is based on information I obtained during my participation in this investigation, from reviewing documents, information provided to me by others, including other law enforcement agents, and through information gained through training and experience.

**III.**

**BACKGROUND AND SUMMARY OF CRIMINAL SCHEME**

"COMPOUNDING" IN GENERAL

9.   In general, "compounding" was a practice by which a licensed pharmacist combined, mixed, or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient.  Compounded drugs were not approved by the U.S. Food and Drug Administration ("FDA"), that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.  The California Board of Pharmacy regulated the practice of compounding in the State of California.

10.   Compounded drugs, including topical compounded creams, may be prescribed by a physician when an FDA-approved drug or ointment did not meet the health needs of a particular patient.  For example, if a patient was allergic to a specific ingredient in an FDA-approved drug, such as a dye or a preservative, a compounded drug or topical

4

cream could be prepared that excluded the substance that triggered the allergic reaction.  Compounded drugs were also available when a patient could not consume a drug by traditional means, such as an elderly patient or a child who could not swallow an FDA-approved pill and needed the drug in a liquid or cream/ointment form that was not otherwise available.

### TRICARE

11.  At all relevant times, TRICARE was a health care benefit program, as defined by 18 U.S.C. § 24(b), and a federal health care program, as defined by 42 U.S.C. § 1302a-7b(f)(1), that provided health care benefits, items, and services to Department of Defense beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

12.   The Defense Health Agency ("DHA"), an agency of the United States Department of Defense, was responsible for overseeing the TRICARE program.  Express Scripts, Inc. ("ESI") was a prescription benefit plan provider that administered TRICARE's prescription drug benefits.  Claims for reimbursement for services rendered or goods provided, including covered compounded drug prescriptions, were submitted to ESI for payment by TRICARE.

13.   TRICARE provided health care benefits for certain prescription drugs, including certain topical compounded creams and ointments, which were medically necessary and prescribed pursuant to TRICARE rules and regulations.  In order to become a pharmacy entitled to submit claims for reimbursement to the TRICARE program, a pharmacy was required to execute a "PSAO Pharmacy Affiliation Authorization" under which the pharmacy agreed to comply with all

1  applicable state and federal laws including, among other things, that
2  no claims for reimbursement would be submitted to TRICARE for filling
3  a prescription absent proof that the prescription followed a face-to-
4  face examination by a physician, reflecting a *bona fide* doctor-
5  patient relationship, and that the fulfilling pharmacy would collect
6  a copayment from the beneficiary at the time of dispensing a
7  prescription.

8      14.  In early 2015, TRICARE announced that, as of the beginning
9  of May 2015, it would no longer be reimbursing pharmacies for filling
10 prescriptions for compound creams at the lucrative reimbursement
11 rates it had been previously providing.  As a result of this
12 impending change in TRICARE's reimbursement policy for compound
13 scripts, Professional Compounding, a business further discussed
14 herein, accelerated its solicitation of compound scripts in March and
15 April 2015 from its established marketers, resulting in the
16 presentation of over 2100 claims for compound scripts to TRICARE, in
17 the billed-for amount of over $14 million, in the two months directly
18 preceding the TRICARE cut-off date of May 2015.

19                    ILWU HEALTH CARE BENEFIT PLAN

20     15.  The International Longshore and Warehouse Union ("ILWU") –
21 Pacific Maritime Association Welfare Plan ("the ILWU Plan") was a
22 health care benefit program for active and retired dockworkers, ship
23 clerks, foremen and watchmen, as well as their qualified dependents
24 and survivors.  The ILWU Plan provided health care benefits for
25 hospital, medical, surgical care and prescription drugs.  The ILWU
26 Plan was a self-funded indemnity plan which received contributions
27 from employers, registered employees, and the ILWU to fund the plan.

28

                                  6

1  Union members were generally guaranteed the maximum benefit,

2  typically 100% of the charge for covered services

3       16.    All persons who enjoyed ILWU Plan eligibility and

4  qualified for hospital, medical and surgical benefits also typically

5  enjoyed eligibility for benefits under the ILWU Prescription Drug

6  Program.

7       17.    The ILWU Plan used OptumRX, a third party

8  administrator/insurer, to process and pay prescription drug claims

9  submitted by health care providers to fill prescriptions written for

10  ILWU plan beneficiaries.  To bill OptumRX for prescription drugs

11  provided to ILWU Plan beneficiaries, a health care provider would

12  submit a claim electronically on a standard claim form (Form 1500),

13  identifying, among other things, the patient's name and

14  identification number, diagnosis, the type of drug dispensed to the

15  ILWU Plan member, the date of service, the charge for the service,

16  the prescribing physician, and the provider.  OptumRX only reimbursed

17  providers for medically necessary prescription drugs.  OptumRX sent

18  reimbursement checks to providers through United States mail.

19       18.    In order to become a pharmacy entitled to submit claims

20  for reimbursement to the ILWU Plan, a pharmacy was required to

21  execute an agreement with OptumRX, whereby it would become an OptumRX

22  Credentialed Pharmacy.  Pursuant to this agreement, the pharmacy

23  agreed to comply with all applicable state and federal laws relating

24  to fraud and abuse.  Based upon guidance provided by OptumRX in its

25  handbook, this included the requirement of avoiding, among other

26  things, illegal remuneration schemes, script mills, and altered and

27  forged prescriptions.

28

19.   Between early 2014 until the beginning of May 2015, it was well-known within the compounding industry, among pharmacists and marketers alike, that TRICARE paid some of the highest rates of reimbursement for the fulfillment of prescriptions for compound creams and related medications.  The ILWU Plan also offered higher rates of reimbursement for compound creams than other comparable health care providers, although generally not quite as generous as TRICARE, and it continued doing so through the middle of 2016.

**IV.**

**STATEMENT OF PROBABLE CAUSE**

**Background and Summary of the Criminal Scheme**

20.   At all relevant times, JAMES NATE BELL ("BELL") was a resident of Anaheim, California.  BELL was the beneficial owner and manager of a pharmacy known as Professional Compounding Pharmacy LLC ("Professional Compounding"), located at 721 W. Whittier Boulevard., Suite H, La Habra, California, with a second location at 570 Central Avenue, Brea, California.  Professional Compounding specialized in the preparation of compound medications, especially compound creams, based upon prescriptions ("scripts") authorized by physicians and physician's assistants, which typically yielded extremely high rates of reimbursement from government and private insurance companies.

21.   BELL was also the beneficial owner and manager of two successive and functionally equivalent purported medical marketing companies, Algia Pharmaceuticals MR&D, located at 1440 East Stearns Avenue, La Habra, California, and Algia Inc., located at 560 Peralta Hill Drive, Anaheim Hills, California ("Algia").  Algia did not actually provide any medical marketing or advertising services for Professional Compounding or for any other pharmacy.  Rather, it

8

served as a financial conduit that enabled Professional Compounding indirectly to pay commissions and/or kickbacks to sales agents and medical marketers who solicited prescriptions for compound creams from physicians and then routed these scripts, once obtained, to Professional Compounding for fulfillment.

22.  REGINA PIEHL ("PIEHL") was a resident of Los Angeles, California.  PIEHL served as a sales agent/marketer for Products For Doctors ("PFD") and in that capacity engaged physicians and physician's assistants to write scripts for compound creams that were routed by PIEHL to PFD and ultimately to Professional Compounding for fulfillment.  PIEHL also served as the owner and operator of a medical care spa known as Coastal Therapy Group, Inc. ("CTG"), which was located at 16818 Hawthorne Boulevard, in Lawndale, California in a building owned by PIEHL.

23.  In her capacity as a sales agent/marketer of scripts for compound creams and related compound medications for Professional Compounding, PIEHL operated three different business entities through which she received and paid commissions for the referral of scripts to Professional Compounding: namely, (1) Worldwide Marketing Group ("WMG"), located as 350 Bellino Drive, Pacific Palisades, California; (2) Global Management Network, Inc. ("GMN"), located at 16818 Hawthorne Boulevard, Lawndale, California; and (3) Century Therapy Group, Inc., located at 350 Bellino Drive, Pacific Palisades, California.

24.  MICHAEL EDWARDS, M.D. ("EDWARDS") was a resident of Huntington Beach, California.  With the assistance of PIEHL, EDWARDS set up and supervised sham clinical pain studies at two different clinics he established that treated patients only once or twice a

week, usually on the weekends. One of these weekends clinics was located at CTG or Century Tech(which was owned by PIEHL) ("the CTG clinic"), and the second weekend clinic was located at 3142 East Plaza Boulevard, Unit T, National City, California, ("the National City clinic"). EDWARDS' clinical studies were supposed to analyze the effectiveness of compound creams, and related compound medications, as an alternative to commonly-prescribed oral medications, such as opioids, for the treatment of pain. In fact, EDWARDS's pain studies exclusively targeted patients who had government or private insurance that paid lucrative reimbursement rates for compounded creams and related medications, and its purpose was simply to generate a high and recurring volume of scripts for compounded creams for patients participating in the studies, the vast majority of which were then routed to Professional Compounding through PIEHL and PFD.

25. EDWARDS received substantial commission payments from PIEHL for having referred all of those compound scripts to Professional Compounding through PIEHL and PFD. PIEHL disguised these commission payments to EDWARDS as supposed charitable contributions to EDWARD'S alleged non-profit research organization, the Foundation for the Permanent Elimination of Nerve Pain and Disability ("the Foundation"), located at 21039 South Figueroa Street, Suite 201, Carson, California, or as payments to one of EDWARDS' business entities, namely, the Mobil Medical Records Association ("MMRA"), at the same address.

26. SARA SAMHAT ("SAMHAT") served as a marketer who assisted EDWARDS in the routing of scripts for compounded creams and related medications to PIEHL and to PFD. SAMHAT received commission payments

from PIEHL for the routing of these scripts for compounded medications to PFD and ultimately to Professional Compounding.  These commission payments were directed in many instances by PIEHL to SAMHAT's marketing company, known as Mobil Medical Records Technology, Inc.("MMRT"), also located at 21039 South Figueroa Street, Suite 201, Carson, California.

27.  "Physician 1" was a licensed California physician, who was hired and paid by EDWARDS to work at the National City clinic. Physician No. 1 was encouraged, directly and indirectly, by EDWARDS to prescribe compound creams or related compound medications to treat patients recruited by EDWARDS and his staff to attend the clinic as part of his purported pain study.

28.  Nurse Practitioner 1 ("NP 1") was a licensed California nurse practitioner, who was hired by PIEHL to work with EDWARDS at the CTG clinic and subsequently referred by PIEHL to assist EDWARDS in treating patients who attended EDWARDS' National City clinic.  NP No. 1 was encouraged, directly and indirectly, by PIEHL, EDWARDS AND SAMHAT, to prescribe compound creams or related compound medications to treat patients recruited by EDWARDS and his staff to seek treatment at the two clinics through which he conducted his sham pain studies.

29.  During the calendar years of 2013-2015, inclusive, the period of time during which BELL, PIEHL, EDWARDS, SAMHAT, and others known and unknown, operated Professional Compounding,  Professional Compounding had the following TRICARE claims activity, substantially all of which was for filling prescriptions for compounded creams and related compound medications:

| CALENDAR YEAR | NUMBER OF CLAIMS | AMOUNT CLAIMED | AMOUNT PAID | AVG PMT/CLAIM |
|---|---|---|---|---|
| 2013 | 62 | $60,344 | $58,004 | $936 |
| 2014 | 1342 | $5,120,445 | $4,407,585 | $3,284 |
| 2015 | 2745 | $17,477,141 | $14,707,029 | $5,358 |

A.   THE FRAUDULENT SCHEME

30.   Beginning at least as early as in or about April 2014, and continuing to in or about May 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, BELL, PIEHL, EDWARDS and SAMHAT, together with others known and unknown, knowingly, willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice to obtain money from health care benefit programs, namely TRICARE and the ILWU Plan, by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

**Evidence of the Scheme**

**Information from CI, and Employee and Patient Interviews**

31.   In concluding that BELL, EDWARDS, PIEHL and SAMHAT, and others known and unknown have committed the Subject Offenses, I have relied on interviews conducted with a confidential informant ("CI"), Professional Compounding employees, and patients who were prescribed compounded drugs manufactured by Professional Compounding; financial and provider records; and information supplied in response to subpoenas issued in this investigation.  As noted above, these facts are not an exhaustive recitation of all the evidence gathered to date but, I submit, are sufficient to establish probable cause.

Setting Up a Compound-Cream Script Mill at the CTG Clinic

1          a.    EDWARDS and PIEHL, and others known and unknown,

2    agreed to take, and took, the following steps, among others, to

3    establish a compound script mill in which ILWU-Plan beneficiaries

4    were recruited, along with NP 1, to generate, prescribe and fill

5    multiple scripts for medically unnecessary compound creams that were

6    subsequently submitted to Professional Compounding for lucrative

7    reimbursement and to fund payments to downstream marketers:

8              i.    In or about early 2014, PIEHL offered NP 1 a

9    part-time job as a nurse practitioner at a clinic at CTG,

10   representing to NP 1 that she was a business partner of EDWARDS, as

11   well as a licensed registered nurse, and that NP 1 would be

12   compensated between $500 and $1500 a day, as a flat rate, to do

13   follow up visits from time to time for EDWARDS' patients at CTG;

14             ii.    Shortly after NP 1 accepted the job, NP 1 was

15   contacted by PIEHL approximately one Saturday a month to travel to

16   the CTG clinic to perform follow up visits on EDWARDS' patients, and

17   in that connection NP 1 was encouraged, particularly by PIEHL, to

18   prescribe compound cream medications to address the pain issues

19   reported by EDWARDS' patients, which he did;

20             iii.    PIEHL would often bring the patients into the

21   treatment room used by NP 1 with pre-printed prescription forms

22   containing specific menu options for the prescribing of compound

23   creams, so that NP 1 merely had to check individual boxes on the

24   forms to ensure the recommended compound creams were prescribed;

25             iv.    The CTG clinic solicited patient beneficiaries

26   from the ILWU Plan by offering payments of $200 per patient if the

27   patients sought treatment for their pain symptoms by requesting

28   compound cream medications, based in part on the pretense that the

1 patients were participating in an authorized study conducted by
2 EDWARDS of the effectiveness of these compound cream medications for
3 which they were entitled to be compensated;

4         v.   In truth and in fact, the alleged pain study was
5 a sham and the $200 payments served solely as a ruse to attract ILWU
6 plan beneficiaries and induce them to accept compound cream
7 prescriptions, which were subsequently sent to Professional
8 Compounding through PFD for processing by the ILWU Plan at high rates
9 of reimbursement; Professional Compounding subsequently paid a
10 significant portion of the reimbursement proceeds it received from
11 the ILWU Plan to downstream marketers, such as PIEHL and SAMHAT;

12         vi.   EDWARDS also separately treated a number of
13 patients at the CTG clinic, all of whom were also paid $200 per
14 visit, and he wrote a number of compound cream prescriptions for
15 these patients that were subsequently submitted to Professional
16 Compounding for fulfillment, as a result of which EDWARDS received
17 referral fees through PIEHL;

18         vii.   After the ILWU Plan beneficiaries completed
19 their initial visits at the CTG clinic with either EDWARDS or NP 1,
20 they were provided with a check for $200 by PIEHL, or by others
21 acting under PIEHL's direction, which was drawn on the bank account
22 of the Foundation for the Permanent Elimination of Nerve Pain and
23 Disability, the alleged non-profit research foundation controlled by
24 EDWARDS.

25         viii.   NP 1 was never informed either by EDWARDS or
26 by PIEHL that the patients he was treating were being paid $200 to
27 attend the clinic or that they were participating in a clinic pain
28 study conducted by EDWARDS to evaluate the effectiveness of compound

cream medications, or for any other genuine medical or scientific purpose.

Setting Up a Second Compound-Cream Mill in National City

b.   EDWARDS, PIEHL and SAMHAT, and others known and unknown, agreed to take, and took, the following steps, among others, to establish a second compound script mill in which TRICARE beneficiaries were recruited, along with NP 1 and Physician 1, to generate, prescribe and fill multiple scripts for medically unnecessary compound creams that were subsequently submitted to Professional Compounding for lucrative reimbursement by TRICARE:

i.   In or about August 2014, as interest in soliciting new ILWU Plan beneficiaries to receive compound scripts waned, EDWARDS, in consultation with PIEHL, decided to initiate a second sham pain study targeting TRICARE beneficiaries located in the San Diego area, which had a large  population of elderly U.S. veterans, including many Filipino veterans;

ii.   To implement this purpose, EDWARDS, assisted by PIEHL and SAMHAT, secured office space from an existing chiropractic practice and set up the National City clinic in around August or September 2014 to offer treatment for pain to TRICARE patients/beneficiaries exclusively on the weekends, typically on Friday or Saturday, when EDWARDS and SAMHAT would travel down from Los Angeles to oversee the operation of the clinic;

iii.   The National City clinic solicited patient beneficiaries from TRICARE by offering payments of $200 per patient if the patients sought treatment for their pain symptoms at the clinic and filled out paperwork for the purported study, based in part on the pretense that the patients were participating in a study

15

conducted by EDWARDS' alleged non-profit Foundation concerning the effectiveness of pain therapies that provided an alternative to standard oral medications (such as opioids), focusing in particular on compound creams;

iv.  In truth and in fact, the Foundation's alleged pain study was a sham, and while EDWARDS hired and paid office staff through his Foundation to obtain paperwork on the patients' pain history, he never collected or retained data concerning the effectiveness of the treatments or medications they received through the National City clinic; in effect, the $200 payments served solely as a ruse to attract TRICARE plan beneficiaries and induce many of them to accept compound cream prescriptions, which were subsequently submitted to Professional Compounding at extremely high rates of reimbursement;

v.  The most important written information obtained by EDWARDS' office staff from their intake with the TRICARE patients participating in the purported study was their gathering of insurance information and military identification, as reflected by the fact that office staff was instructed as the first item of their "Photo Copy Checklist" to ensure that a copy of each patient's TRICARE card and military ID was maintained in the file for subsequent billing;

vi.  Aside from hiring marketers and staff at the National City clinic through the Foundation to solicit TRICARE plan beneficiaries and obtain necessary identifying TRICARE insurance information, EDWARDS, with the assistance of PIEHL, hired NP 1 and Physician 1, as well as other physicians and physician assistants, regularly to work at the clinic on weekends, and EDWARDS and PIEHL jointly paid compensation to NP 1 and Physician 1 for their work at

1   the clinic on a per diem basis through various corporations that they

2   separately controlled;

3            vii. In connection with NP 1's work at the National

4   City clinic, NP 1 was directly and indirectly encouraged by EDWARDS,

5   as well as by others working at the clinic, to prescribe a nearly

6   identical set of compound cream medications to virtually all the

7   patients he treated from a pre-printed form that was provided to him

8   by the clinic, and shortly after NP 1 completed treating patients he

9   occasionally overheard EDWARDS informing patients that they would be

10  getting paid;

11           viii.    When EDWARDS engaged Physician 1 to work at

12  the National City clinic, he informed him that, in collaboration with

13  SAMHAT, he set up the clinic to study the effectiveness of compound

14  cream medications for the treatment of pain, and EDWARDS and SAMHAT

15  provided Physician 1 with a small number of prescription templates

16  from particular pharmacies that contained specific menu options for

17  the prescribing of compound cream scripts, several of which they

18  recommended as having been highly effective;

19           ix.  Relying in significant part on the

20  recommendations of EDWARDS, who was acting in coordination with

21  SAMHAT, Physician 1 wrote several hundred scripts for compound creams

22  for numerous TRICARE beneficiaries between approximately October 2014

23  and January 2015, the vast majority of which were forwarded to

24  Professional Compounding for fulfillment through PFD, and resulted in

25  several million dollars in reimbursements from TRICARE to

26  Professional Compounding and in payments by Professional Compounding

27  to downstream marketers such as PIEHL and SAMHAT;

28

x.    After NP 1 and Physician 1 completed writing compound scripts for individual patients at the National City clinic, the scripts and patient files were transmitted to the custody of SAMHAT, who reviewed the scripts and in some instances told Physician 1 to check certain boxes on the script forms that he had supposedly overlooked or omitted, after which the scripts were routed by SAMHAT and by office staff working under the direction of  EDWARDS and SAMHAT to PFD before finally being transmitted to Professional Compounding; in several instances, SAMHAT and EDWARDS also caused the insurance cards and military identification cards of TRICARE beneficiaries, containing personal identifying information (such as social security numbers),  to be faxed electronically to PFD, along with their compound cream scripts;

xi.   On several occasions, the scripts that were written by NP 1 and Physician 1 for compound creams were modified without the consent of NP 1 or Physician 1 after they were turned over to the custody of SAMHAT and EDWARDS and transmitted to PFD and then to Professional Compounding, such that the modified scripts reflected that between six and eleven refills of the compound cream scripts were authorized, when in fact NP 1 and Physician 1 only actually authorized refills of these scripts on an as-needed basis; the vast majority of these fraudulently modified  scripts for refills were submitted to ESI by Professional Compounding for payment by TRICARE;

xii.   When the issue arose as who was going to bear responsibility for paying for the compound creams that were prescribed through the pain study conducted at the National City clinic, SAMHAT falsely assured patients that the clinic would be

18

providing patients with a free trial for a month of these creams, while EDWARDS told TRICARE beneficiaries not to worry because they would not be required to make any out-of-pocket payments for these creams even if their insurance provider was billed for the creams. In truth, EDWARDS and SAMHAT both well knew that: (1) TRICARE would be paying extremely high rates of reimbursement for these compound cream claims, as much as $3000-10,000 per tube of cream; (2) TRICARE had not agreed to waive their beneficiaries' obligation to make a co-payment on these compound cream prescription claims, and (3) TRICARE had neither been informed of, nor agreed to, paying for compound creams prescribed in connection with EDWARDS' purported pain study.

xiii.    EDWARDS also separately treated a number of patients on his own at the National City clinic, all of whom were also paid $200 per visit, and he wrote a number of compound cream prescriptions for these patients that were subsequently submitted to Professional Compounding for fulfillment, as a result of which EDWARDS received commission payments through the Foundation;

xiv.    After the TRICARE beneficiaries completed their initial visits at the National City clinic with either EDWARDS, Physician 1 or  NP 1, and other physicians and physician assistants, they were provided with a check for $200 by EDWARDS, or by others acting at EDWARDS' direction, which was drawn on the bank account of the Foundation.

PFD Agrees To Accept Compound Scripts For Tricare Beneficiaries

c.    Beginning in or about September 2014, PIEHL contacted one of the principals of PFD in order to secure PFD's agreement to accept a large volume of compound cream scripts for TRICARE beneficiaries that were generated by the National City clinic, and

1    PIEHL and PFD subsequently took the following steps to ensure that

2    these scripts would be provided to PFD and then forwarded to

3    Professional Compounding for submission to TRICARE at lucrative

4    reimbursements rates:

5            i.   In early September 2014, PIEHL reported to the

6    principals of PFD that she had located a great new program down in

7    San Diego involving a pain study affiliated with EDWARDS that focused

8    on prescribing compound creams for TRICARE beneficiaries, and she

9    wanted to refer these scripts to PFD for processing with the

10   compounding pharmacies with which PFD was affiliated, including

11   Professional Compounding;

12           ii.  In internal discussions among the principals of

13   PFD, there was concerns that PFD would not be able to accept this

14   business, because TRICARE was a federally funded-health insurance

15   program and receipt and/or payments of commissions or referral fees

16   to marketers for the submission of such scripts to pharmacies would

17   potentially violate federal anti-kickback statutes; in fact, the

18   sales commission agreement between PFD and Algia, the marketing arm

19   of Professional Compounding, expressly provided that there shall be

20   "[n]o Commission for Government-Paid Prescriptions." However,

21   defendant BELL falsely assured the principals of PFD that payment of

22   commissions to PFD by Algia would not run afoul of the federal anti-

23   kickback statute because Algia was an independent marketing company,

24   separate from Professional Compounding, such that PFD was not

25   effectively receiving commission payments from a pharmacy.

26           iii. Despite the legal and contractual impediments to

27   PFD's acceptance of PIEHL's proposal to process compound scripts for

28   TRICARE beneficiaries, PFD overruled the reservations of other PFD

principals and accepted the referral of a large number of compound scripts for TRICARE beneficiaries from the National City clinic between October 2014 and May 2015, which were subsequently submitted to Professional Compounding for fulfillment and reimbursement by TRICARE;

            iv.  As a result of PFD's decision, PFD received over $9 million in commission payments for the referral of compound scripts for TRICARE beneficiaries from Professional Compounding between October 2014 and May 2015, and PIEHL received over $2.5 million in commission payments from PFD, a significant portion of which she transferred to EDWARDS and SAMHAT through various entities that they jointly controlled;

            v.  After TRICARE significantly reduced its reimbursement rates for compound creams starting in the beginning of May 2015, PFD discontinued its submission to Professional Compounding of compound scripts for TRICARE beneficiaries; however, it continued to accept and submit compound scripts for ILWU beneficiaries that originated from the CTG clinic through approximately April 2016, because OptumRX continued to pay reimbursements on behalf of ILWU Plan beneficiaries for compound cream prescriptions at relatively high levels through April 2016.

    <u>Fraudulent Claims Submitted To TRICARE and the ILWU Plan</u>

      d.  BELL, and others known and unknown, used, and directed employees of Professional Compounding to accept compounded drug prescription forms that were distributed to marketers and doctors for the purpose of filling compounded drug prescriptions.  The forms identified multiple compounded drug formulations, purportedly to treat pain, stretch marks, migraines, and wounds, and to promote

general wellness, that were included because they provided the maximum possible TRICARE and/or ILWU Plan reimbursements, not because they addressed legitimate, individual patient needs or were medically necessary.

e.    BELL, aided and abetted by PIEHL, EDWARDS, and SAMHAT filled and caused to be filled compounded drug prescriptions and caused false and fraudulent claims for reimbursement to be submitted to TRICARE and to the ILWU Plan, and to other private health care programs, claims that were demonstrably spurious because, among other things:

i.    Substantially all of the prescriptions were faxed or electronically sent to Professional Compounding from marketers to whom Professional Compounding had agreed to pay illegal kickbacks disguised as advertising or marketing fees, when in truth and in fact these scripts were solicited from doctors and patients who were paid by marketers principally in order to enable these marketers to realize kickbacks on each script reimbursement by TRICARE, the ILWU Plan, or other private health care benefit programs.

ii.    Substantially all of the prescriptions were identically or nearly identically described on the same or similar prescription form or pad that identified pre-formulated compounds, and these forms typically originated with Professional Compounding and were refined by the marketers to maximize reimbursement rates.

iii.   Few, if any, of the beneficiaries for whom the prescriptions were provided ever paid, nor did Professional Compounding attempt or ever intend to collect, any co-payment as required by TRICARE.

iv.   The relatively small number of purported prescribing physicians recurred on multiple prescriptions and on multiple refills of prescriptions, even though in several instances these physicians did not in fact actually prescribe multiple refills but indicated only that refills were authorized on an as-needed basis.

v.    Professional Compounding conducted little, if any, due diligence upon receipt of the prescriptions to verify whether, in fact, the beneficiaries actually sought the prescribed medications.  Indeed, in several instances Professional Compounding either deliberately refrained from calling beneficiaries to avoid giving notice to beneficiaries or in other instances ignored beneficiaries' complaints that the prescriptions were either ineffective or not needed at all, especially after the initial round of prescriptions had been sent out.

vi.   The compounded formulations were virtually identical for all of the beneficiaries regardless of their purported illnesses, and none of the prescriptions was specifically formulated based on the individualized needs, medical history, allergic reaction potential, contraindications, or conflicts with other prescription medications that were unique to each beneficiary.

vii.   In submitting reimbursement claims for the compound cream prescriptions filled at Professional Compounding, BELL generally billed the health insurance providers based upon use of a relatively expensive base cream ingredient known as Versepro, when in fact BELL typically used a significantly less expensive base cream in preparing the compound cream mixtures, which if accurately reported

1    to TRICARE or the ILWU Plan would have warranted a lower

2    reimbursement amount.

3         <u>Bell's Attempt To Conceal the Tricare Kickback Scheme</u>

4              f.    In or about August 20, 2016, in connection with

5    responding to TRICARE inquiries regarding the business records and

6    activities of Professional Compounding, BELL requested a meeting with

7    PFD and one of the other principals of PFD to discuss concerns he had

8    regarding the fact that Professional Compounding had been improperly

9    paying millions dollars in kickbacks to PFD based on adjudicated

10   claims paid by TRICARE to Professional Compounding.

11             g.    In this meeting, BELL conceded that he was not

12   supposed to be paying referral or commission fees to PFD on TRICARE

13   claims (as prohibited in the existing contract between PFD and

14   Algia), but he proposed that PFD execute a new, backdated contract

15   with Algia, pursuant to which all money that Algia historically paid

16   to PFD would be accounted for as commission payments for referrals of

17   compound scripts reimbursed by private or PPO insurance plans, not by

18   TRICARE.

19             h.    Based on this new proposed fictitious contract between

20   Algia and PFD, Algia would make commission payments to PFD, and other

21   marketers, "equivalent to 97.5% of adjudicated amounts paid by non-

22   government sponsored private insurance for compounded prescription

23   drugs," as opposed to the 43% commission payment provided for in the

24   actual existing contract between Algia and PFD.  By falsely revising

25   the contract in this way and backdating it to make it look like it

26   was executed contemporaneously, BELL indicated that he could explain

27   to auditors or those reviewing his business accounts that all the

28   monies he paid to PFD related to referral fees owed based on

                                      24

reimbursement of private insurance claims, rather than based on referral fees for reimbursement of TRICARE claims.

i.   In providing a copy of this fictitious contract to two of the principals of PFD, defendant BELL assured the PFD participants that if they agreed to execute this new proposed fictitious contract, defendant BELL would be able to survive government scrutiny of his business practices at Professional Compounding and Algia and the PFD principals would never have to hear about this again.

B.   <u>EXECUTIONS OF THE FRAUDULENT SCHEME</u>

32.   On or about January 29, 2020, a Federal Grand Jury for the United States District Court for the Central District of California returned an Indictment on charges related to the Subject Offenses aforementioned in this affidavit.  The Indictment charged twenty-one counts of aiding and abetting involving BELL, who aided and abetted by PIEHL, EDWARDS and SAMHAT, knowingly and willfully executed and attempted to execute the fraudulent scheme described above, by submitting and causing to be submitted to TRICARE and the ILWU Plan the following false and fraudulent claims:

| DATE | CLAIM(S) |
|------|----------|
| 2/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary F.G. |
| 2/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.G. |
| 3/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary F.G. |

25

| DATE | CLAIM(S) |
|---|---|
| 3/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.G. |
| 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. |
| 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.S. |
| 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary C.S. |
| 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. |
| 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. |
| 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary D.S. |
| 7/9/15 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary P.S. |
| 7/9/15 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary B.S. |
| 7/21/15 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary P.S. |
| 12/7/15 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $11,958 for compounded drug prescription in the name of beneficiary S.S |
| 1/4/16 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $11,958 |

| DATE | CLAIM(S) |
|------|----------|
|  | for compounded drug prescription in the name of beneficiary B.S. |
| 1/29/16 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary B.S. |
| 2/2/16 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary A.C. |
| 2/2/16 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary V.C. |
| 2/16/16 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary A.C. |
| 2/16/16 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary V.C. |
| 4/8/16 | Claim submitted by Professional Compounding to OptumRX in the approximate amount of $12,080 for compounded drug prescription in the name of beneficiary A.C. |

## THE MAIL FRAUD SCHEME

33.  The Indictment also charged six counts of mail fraud, involving BELL, PIEHL, EDWARDS and SAMHAT, who together with others known and unknown to the Grand Jury defrauded, devised, participated in, a scheme and artifice to obtain money and property from TRICARE and from ILWU Plan, and from other health care benefit programs, by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

34.  On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California and elsewhere, BELL, PIEHL, EDWARDS, and SAMHAT, for the purpose of executing and attempting to execute the above-described scheme to defraud, willfully caused the items below to be placed in an authorized depository for mail to be sent and delivered by the United States Postal Service, according to the directions thereon:

| DATE | ITEM MAILED |
|---|---|
| 2/5/15 | TRICARE payment, check no. 8327230, in the approximate amount of $298,641 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA |
| 3/5/15 | TRICARE payment, check no. 8333105, in the approximate amount of $418,910 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located in La Habra, CA |
| 4/30/2015 | TRICARE payment, check no. 8344629, in the approximate amount of $1,361,464 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA |
| 5/14/15 | TRICARE payment, check no. 8347615, in the approximate amount of $2,999,915 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA |
| 10/25/15 | ILWU Plan payment, check no. 564983, in the approximate amount of $74,076 and payable to Professional Compounding Pharmacy was mailed from OptumRX offices located in Schaumberg, IL to Professional Compounding Pharmacy located in Brea, CA |
| 3/17/16 | ILWU Plan payment, check no. 8497885, in the approximate amount of $106,382 and payable to Professional Compounding Pharmacy was mailed from OptumRX offices located in Cypress, CA to |

| DATE | ITEM MAILED |
|------|-------------|
|      | Professional Compounding Pharmacy located in Brea, CA |

32.   The Indictment also charged sixteen counts of Illegal Remunerations related to health care fraud involving BELL, PIEHL and EDWARDS identified below, who knowingly and willfully offered to pay, paid, and caused to be offered and paid remuneration to marketers, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Professional Compounding for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| DATE | | APPROXIMATE AMOUNT |
|------|------|-------------|
| 2/12/15 | BELL | $140,316 |
| 2/20/15 | PIEHL | $19,400 |
| 2/20/15 | PIEHL | $20,000 |
| 3/12/15 | BELL | $406,014 |
| 3/23/15 | PIEHL | $19,070 |
| 3/26/15 | PIEHL | $4000 |
| 3/27/15 | BELL | $687,616 |
| 4/17/15 | BELL | $760,501 |
| 4/23/15 | PIEHL | $26,200 |
| 4/24/15 | BELL | $795,414 |

33.   The Indictment also charged six counts of illegal receipt of remunerations involving PIEHL and SAMHAT identified below, who knowingly and willfully solicited and received remuneration, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Professional Compounding for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| DATE | | ITEM | APPROXIMATE AMOUNT |
|------|------|------|-------------|
| 3/4/15 | PIEHL | Check No. 6164 to entity WWM from BofA 9702 in the name of PFD signed by DL | $33,884 |
| 3/8/15 | EDWARDS | Check no. 1047 to entity | $16,800 |

| DATE | | ITEM | APPROXIMATE AMOUNT |
|------|------|------|---------------------|
| | | MMRA from OB 1860 signed by PIEHL | |
| 3/9/15 | EDWARDS | Check no. 1050 to entity the Foundation from OB 1860 signed by defendant PIEHL | $6,000 |
| 3/23/15 | SAMHAT | Check no. 1052 to entity MMRT from OB 1860 and signed by PIEHL | $17,000 |
| 4/5/15 | SAMHAT | Check no. 0488 to entity MMRA from BofA 0486 signed by PIEHL | $5,100 |
| 4/19/15 | SAMHAT | Check no. 441 to entity MMRT from BofA 0486 signed by PIEHL | $16,400 |
| 5/14/15 | PIEHL | Check no. 6556 to entity CTG from BofA 9702 signed by RV | $22,000 |

34.   The Indictment also charged four counts of money laundering involving BELL who knowingly engaged in, and aided and abetted, the following monetary transactions described below, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, namely, mail fraud as specified in paragraphs 27-29 above, in violation of Title 18, United States Code, Section 1341:

| DATE | FINANCIAL TRANSACTION |
|------|------------------------|
| 2/23/15 | Transfer of approximately $92,855 from JP Morgan Chase Bank account ending in number 4060 in the names of BELL and CB ("JPMC 4060") to Renick Cadillac by means of check no. 1214, payable to Renick Cadillac, dated 2/22/15 |
| 5/21/15 | Transfer of approximately $500,000 from JP Morgan Chase Bank account ending in number 0852 in the names of Algia, Inc. ("JPMC 0852") to Morgan Stanley, through wire transfer, reference no. ending 0164, Fed wire no. ending 2460 |
| 6/24/15 | Transfer of approximately $2,600,000.00 from JPMC 0852 to Morgan Stanley, through wire |

| | | |
|---|---|---|
| | | transfer, reference no. ending 1173, Fed wire no. ending 2636 |
| | 9/16/15 | Transfer of approximately $3,927,014 from JPMC 4060 to Alliance Mutual Escrow, Inc., through a wire transfer, reference no. ending in 258E, Fed wire no. ending 2205 for escrow no. 10778LW |

**V.**

**BANK AND FINANCIAL INVESTMENT ACCOUNTS**

<u>JP Morgan Chase</u>

35.   As previously described, BELL was the beneficial owner and manager of two successive and functionally equivalent purported medical marketing companies, Algia Pharmaceuticals MR&D and Algia Inc., however, Algia did not actually provide any medical marketing or advertising services for Professional Compounding or for any other pharmacy.   Algia basically served as a sham company based out of BELL's primary residence, that he used to funnel TRICARE proceeds to Algia and then to his personal bank accounts and pay, among other things, commissions and/or kickbacks to individuals involved in the fraud scheme.   BELL used the Algia bank accounts (primarily funded with proceeds from the fraud scheme) to purchase among other things, luxury vehicles, luxury jewelry, expensive paintings, exotic vacations, a luxury home in Anaheim Hills, California, and fund investment and retirement accounts in his and his wife's names.

36.   According to bank records received from JP Morgan Chase Bank ("JPMC"), Professional Compounding maintained bank account number ending 0261 as their primary business account from 2013 to 2016.   This account was held in the name Professional Compounding Pharmacy, signature James N. Bell and Amrutlal M. Shah, and opened on or about February 11, 2013.   On or about July 29, 2014, Shah's name

31

was removed from this account and only BELL's name remained as signatory for JPMC 0261.

37.  According to bank records received from JP Morgan Chase Bank ("JPMC"), Algia maintained bank account number ending 0852 ("JPMC 0852") as their primary business account from 2015 to 2017. This account was held in the name of Algia, Inc., signature James N. Bell, and opened on or about January 7, 2015.

38.  According to bank records received from JP Morgan Chase Bank ("JPMC"), James and Crystal Bell maintained bank account number ending 4060 ("JPMC 4060") as their primary personal account, and maintained savings account number ending 0701 ("JPMC 0701") from 2014 to 2018. These accounts were originally opened on or about October 16, 2010.  As of January 29, 2014, these accounts were held in the name of James N. Bell or Crystal Bell.

<u>Morgan Stanley</u>

39.  According to financial investment records received from Morgan Stanley ("MS"), James Bell and Crystal Bell maintained the following accounts:

a.  Account number ending 1405 ("MS 1405") held in the name MSL FBO James N. Bell and Crystal Bell, CO-TTEE James & Crystal Bell, Trust U/A/ DTD 10/19/2015, signature James N. Bell and Crystal Bell, and opened in or about November 22, 2014. During the course of the above-described scheme, MS 1405 received at least $6,150,000.00 in tainted funds (proceeds from the fraud scheme.)

b.  Account number ending 3104("MS 3104") held in the name MSL FBO James N. Bell and Crystal Bell, CO-TTEE James & Crystal Bell, Trust U/A/ DTD 10/19/2015, signature James N. Bell and

32

Crystal Bell and opened in or about June 2015.  During the course of the above-described scheme, MS 3104 received at least $1,550,000.00 in tainted funds (proceeds from the fraud scheme.)

**PROBABLE CAUSE FOR SEIZURE OF THE SUBJECT VEHICLE**

40.  In February, 2015, James and Crystal Bell paid approximately $92,855 for the purchase of the Subject Vehicle, a 2015 Cadillac Escalade, VIN 1GYS3MKJ7FR578933.  An analysis of bank records and purchase invoices shows the following:

a.  On or about February 12, 2015, the beginning balance in JPMC 4060 was $18,105.91.

b.  On or about February 13, 2015, check #1016 from Algia in the amount of $100,000.00 (proceeds from fraud scheme) was paid to James N. Bell and deposited into savings account JPMC 0701.

c.  On or about February 22, 2015, the ending balance in JPMC 4060 was $23,614.09.

d.  On or about February 23, 2015, $80,000.00 from savings account JPMC 0701 was transferred to JPMC 4060. The ending balance in JPMC 4060 on February 23, 2015 was $103,057.02.

e.  On or about February 23, 2015, check #1214 in the amount of $92,855 (from JPMC 4060) was paid to Renick Cadillac towards the purchase of the Subject Vehicle.  The ending balance in JPMC 4060 on February 23, 2015, after check #1214 cleared was $10,201.28.

f.  The Subject Vehicle is believed to be located on the premises of Bell's residence, 560 S. Peralta Hills Drive, Anaheim, California 92807.

**PROBABLE CAUSE FOR SEIZURE OF THE SUBJECT MORGAN STANLEY FINANCIAL**

**INVESTMENT ACCOUNTS**

Active Assets Account number ending 1405 (SUBJECT ACCOUNT 1)

44.   In May 2015, during beginning of the height of the fraud scheme wherein BELL, PIEHL, EDWARDS, and SAMHAT knew that their schemes would generate an exuberant amount of reimbursements from the claims filed with TRICARE for, among other things, fraudulent compounding prescriptions.  In one month alone, from their collective efforts to generate claims to collect reimbursements from TRICARE, there were four TRICARE checks totaling at least $8,441,000.00 that Professional Compounding received from claims filed related to the fraudulent compounding prescriptions during the above described fraud scheme. The following checks were deposited into the Professional Compounding checking account JPMC 0261, for which BELL was a signatory:

a.   Tricare Check# 2338656 (dated 4/29/2015) for $1,254,790.63 deposited to PCP JPMC 0261 on May 5, 2015

b.   Tricare Check# 8344629 (dated April 29, 2015) for $1,361,464.19 deposited to PCP JPMC 0261 on May 5, 2015

c.   Tricare Check# 2341284 (dated May 13, 2015) for $2,824,912.12 deposited to PCP JPMC 0261 on May 18, 2015

d.   Tricare Check# 8347615 (dated May 13, 2015) for $2,999,915.63 deposited to PCP JPMC 0261 on May 18, 2015

45.   In the same month of May 2015, $8,400,000.00 in JPMC 0261 (proceeds from the fraud scheme) was withdrawn from Professional Compounding via checks, electronic transfers, and wires, and deposited into Algia JPMC 0852. On May 1, 2015, the beginning balance in the Algia JPMC 0852 was approximately $45,000.00.

46.     On or about May 1, 2015, the beginning balance in Subject Account 1 was $50,164.89.  According to Morgan Stanley records there were at least $6,150,000.00 in wires from JMC 0852 reflecting transfers to Subject Account 1 during the fraud scheme as follows:

a.   May 21, 2015, $500,000.00 wire Ref# 147I0244, Fed ref number ending 2621;

b.   May 27, 2015, $500,000.00 wire Ref# 147I0164, Fed ref number ending 2460;

c.   June 5, 2015, $400,000.00 wire Ref# 156I0974, Fed ref number ending 0860;

d.   June 24, 2015, $2,600,000.00, Ref: 175I1173, Fed ref number ending 2636;

e.   August 11, 2015, $1,650,000.00 Ref: 223I0937, Fed ref number ending 3988;

f.   January 12, 2016, $500,000.00 Ref: 012I0117, Fed ref number ending 0533

47.   Other deposits made to Subject Account 1  during the fraud scheme included a $150,000.00 transfer on January 13, 2016, Ref# 013I0127, Fed ref number ending 0228 from JPMC 4060 (James and Crystal Bell).

48.   According to Morgan Stanley records, during the fraud scheme there were approximately $2,879,000.00 in withdrawals from Subject Account 1 that included:

a.   On June 8, 2015, a $400,000.00 transfer to Subject Account 2, confirmation number ending 1075

b.   On June 25, 2015, a $600,000.00 transfer, to Subject Account 2 confirmation number ending 4379

c.   On August 12, 2015, a $550,000.00 transfer, to Subject Account 2, confirmation number ending 8315;

d.   On April 14, 2016, a $1,329,000.00 wire transfer, Ref# 10526722, Fed ref number ending 0085, to JPMS 4060 (BELL's personal checking account.

<u>Morgan Stanley Active Assets Account number ending 3104</u>

<u>(SUBJECT ACCOUNT 2)</u>

49.   According to Morgan Stanley records Subject Account 2 was opened on or about June 8, 2015.  As stated above (paragraph #48), Subject Account 2 received transfers of $1,550,000.00 (proceeds from the fraud scheme) from Subject Account 1.

**CONCLUSION**

50.  For all the reasons described above, there is probable cause to believe that the Subject Assets represent property which constitutes or is derived from proceeds traceable to one or more violations of the following statutes, and are therefore subject to seizure pursuant to 18 U.S.C. §981(b) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C):

a.   mail fraud, in violation of Title 18, United States Code, Sections 1341;

b.   wire fraud, in violation of Title 18, United States Code, Sections 1343;

c.   healthcare fraud, in violation of Title 18, United States Code, Section 1347;

d.   conspiracy to commit fraud, in violation of Title 18,

36

United States Code, Section 1349;

  e. conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956;

  f. aggravated identity fraud, in violation of Title 18, United States Code, Section 1028(A);

  g. conspiracy to pay illegal remunerations for health care related purchases in violation of Title 18, United States Code Section 371; and,

  h. illegal remunerations for health care related purchases in violation of Title 42 United States Code Section 1320a-7b(b) (the "Subject Offenses").

//

//

51.   In addition, there is probable cause to believe that the Subject Assets are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f) because they would, in the event of conviction on the alleged underlying offenses, be subject to forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

_____
CORY ORAVECZ, Special Agent
Defense Criminal Investigative
Service

Subscribed to and sworn before me
This _____ day of February, 2020.

_____
        HONORABLE
        UNITED STATES MAGISTRATE
        JUDGE